1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

TAMMIE LAMPHERE, Personal
Representative of the ESTATE OF
KRISTOPHOR JOHN LAMPHERE,
deceased, TAMMIE LAMPHERE,
individually, MARISSA CHACON,
individually, by and thru her mother,
TAMMIE LAMPHERE, BRIANA
CHACON, individually, by and through
her mother, TAMMIE LAMPHERE,
LINDA KOLM, Personal Representative
of the ESTATE OF KARL KOLB,
deceased, LINDA KOLB, individually,
BRETT KOLB, individually, DONALD L.
WOMBLE, SR., Personal Representative
of the ESTATE OF DONALD L.
WOMBLE, JR., deceased, DONALD L.
WOMBLE, SR., individually, JEANNE
WOMBLE, individually, KRISTIN
WOMBLE, individually, by and through
her mother, STACEY L. GARDNER,
AMBER WOMBLE, individually,
DONALD L. WOMBLE, III, by and
through his mother, STACEY L.
GARDNER,

                                    Plaintiffs,

        vs.

UNITED STATE OF AMERICA,

                                    Defendant.

CASE NO. 06CV2174-LAB (JMA)
(Consol. w/06cv2192)
(Consol. w/06cv2175)

**ORDER GRANTING DEFENDANT
SUMMARY ADJUDICATION OF
CERTAIN PLAINTIFFS' LOSS OF
CONSORTIUM CLAIMS**

[Dkt Nos. 47, 49, 51, 53]

06CV2174

1    This consolidated Federal Tort Claims Act case arising out of an airplane accident is
2    before the court on four Motions For Summary Judgment defendant the United States of
3    America ("Defendant") has filed for adjudication of the loss of consortium claims advanced
4    by certain sets of plaintiffs ("Motions").  Each set of plaintiffs filed an Opposition, and the
5    government filed separate Replies.  Pursuant to Civil Local Rule 7.1(d)(1), the court finds the
6    issues presented appropriate for decision on the papers and without oral argument.  For the
7    reasons discussed below, the Motions are **GRANTED**.

8    **I.     BACKGROUND**

9    Plaintiffs' decedents are four of five passengers or crew on a New Mexico-based air
10   ambulance service plane which crashed shortly after takeoff from Brown Field Municipal
11   Airport in San Diego, California on October 24, 2004.  Plaintiffs allege air traffic controllers,
12   employed by the Federal Aviation Administration, were negligent and caused the accident.
13   Defendant denies those allegations.  The First Amended Complaint ("FAC"), consolidating
14   the claims in one pleading, presents multiple survival actions and claims for damages for
15   wrongful death and loss of consortium.  Dkt No. 33.  By Order entered May 10, 2007, this
16   court decided the choice of law issues, concluding the measure of damages will be decided
17   under the law of New Mexico, and liability issues will be decided under California law.
18   Dkt No. 23.  The Motions seek summary adjudication of only the loss of consortium and loss
19   of guidance and counseling claims of only certain of the plaintiffs, on grounds those plaintiffs
20   cannot establish elements essential to recovery of damages under those theories.

21   **II.    LEGAL STANDARDS**

22   **A.     Summary Adjudication Of Issues**

23   Federal Rule of Civil Procedure ("Rule") 56(c) empowers the court to enter summary
24   judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy
25   and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325,
26   327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to
27   interrogatories, and admissions on file, together with the affidavits, if any, show that there
28   is no genuine issue as to any material fact and that the moving party is entitled to judgment

1   as a matter of law.  Rule 56(c); *see also* <u>Arpin v. Santa Clara Valley Transp. Agency</u>, 261

2   F.3d 912, 919 (9th Cir. 2001).  A fact is material if it "might affect the outcome of the suit

3   under governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  A court

4   considering summary adjudication of issues does not make credibility determinations or

5   weigh conflicting evidence, as those determinations are for the trier of fact and are

6   inappropriate in summary proceedings. <u>Anderson</u>, 477 U.S. at 249.  The court considers the

7   evidence in the light most favorable to the non-moving party. <u>Id.</u> at 255.  However, the court

8   is not required to accept conclusory allegations nor does the court assume the truth of legal

9   conclusions merely because they are cast in the form of factual allegations.  <u>Warren v. Fox</u>

10  <u>Family Worldwide, Inc.</u>, 328 F.3d 1136, 1139 (9th Cir. 2003).

11        The moving party bears the initial burden of identifying the elements of the claim

12  which that party "believes demonstrates absence of a genuine issue of material fact."

13  <u>Celotex</u>, 477 U.S. at 323;  <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).  The burden

14  then shifts to the nonmoving party to establish, beyond the pleadings, that there is a triable

15  issue. <u>Celotex</u>, 477 U.S. at 324; <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970);

16  <u>Arpin</u>, 261 F.3d at 919.  Where the plaintiff bears the burden of proof at trial, summary

17  judgment for the defendant is appropriate if there is an absence of evidence to support the

18  claim.  *See* <u>Celotex</u>, 477 U.S. at 325; *see also* <u>Garneau v. City of Seattle</u>, 147 F.3d 802, 807

19  (9th Cir. 1998).  To successfully rebut a properly supported motion, a plaintiff "must point

20  to some facts in the record that demonstrate a genuine issue of material fact and, with all

21  reasonable inference made in the plaintiffs' favor, could convince a reasonable jury to find

22  for the plaintiffs."  <u>Reese v. Jefferson School Dist. No. 14J</u>, 208 F.3d 736, 738 (9th Cir.

23  2000), *citing, inter alia,* <u>Celotex</u>, 477 U.S. at 323.  If the party opposing the motion fails to

24  make a sufficient showing on an element of his or her case, the movant is entitled to

25  judgment as a matter of law. <u>Celotex</u>, 477 U.S. at 325; <u>Anderson</u>, 477 U.S.  at 250-251

26  (summary judgment must be entered "if, under the governing law, there can be but one

27  reasonable conclusion as to the verdict"); *see* <u>Matsushita Elec.  Indus.  Co., Ltd.  v.  Zenith</u>

28  \\

1  Radio Corp., 475 U.S. 574, 586-87 (1986) (there is no genuine issue for trial if, on the record

2  as a whole, a rational trier of fact could not find in favor of the party opposing the motion).

3  **B.    Cognizable Claims For Loss Of Consortium Damages**

4  In deciding these Motions, the court addresses only those tort claims seeking

5  recovery of damages for loss of consortium and related lost guidance and counseling

6  challenged by the Motions.  The court expresses no opinion on the targeted Plaintiffs' ability

7  to prove liability or damages under their Wrongful Death Act causes of action or otherwise.

8  Loss of consortium is a limited claim cognizable under New Mexico common law.

9  That theory of recovery is available only to certain categories of claimants in their individual

10  capacities when the nature of their relationship with the injured or deceased person satisfies

11  certain intimacy criteria, and when a legal duty predicated on forseeability to the tortfeasor

12  of the loss to the claimant can be imputed.  See, e.g., Romero v. Byers, 872 P.2d 840, 847,

13  843 (N.M. 1994) (recognizing a loss of consortium cause of action in a spousal relationship,

14  defining the claim as "the emotional distress suffered by one spouse who loses the normal

15  company of his or her mate when the mate is physically injured due to the tortious conduct

16  of another," finding the duty of a potential tortfeasor to the spouse arises form the

17  foreseeability of damage to the close relationship typically shared by husband and wife).

18  The duty analysis was framed by the Supreme Court of New Mexico in Solon v. WEK

19  Drilling Co., Inc., 829 P.2d 645, 648, 650 (N.M. 1992) (holding any injuries to the parents of

20  an adult child who lived with them and provided them household services were not

21  foreseeable, and could therefore not support the parents' claims for loss of consortium and

22  loss of economic support associated with their son's death in a work-related accident); see

23  Fernandez v. Walgreen Hastings Co., 968 P.2d 774, 783-84 (N.M. 1998) (tracing "a series

24  of New Mexico cases culminating in" the Solon "test for determining whether a duty is owed

25  to a plaintiff" in tort cases, and holding that test should be applied to loss of consortium

26  claims), citing Romero, 872 P.2d 840.  The injury will be found foreseeable, and a plaintiff

27  may recover for loss of consortium, only in circumstances where the plaintiff had an "intimate

28

1   familial relationship" with the decedent.[1] <u>Lozoya v. Sanchez</u>, 66 P.3d 948, 957 (N.M. 2003).

2       As traced by Defendant, the New Mexico courts appear to recognize two types of

3   "intimate familial relationships" warranting the availability of damages recovery for loss of

4   consortium:  (1) the relationship between spouses or an equivalent relationship (<u>Lozoya</u>, 66

5   P.3d at 957, 961, 958) and (2) the relationship between a familial caretaker and a minor child

6   or an equivalent relationship (<u>Fernandez</u>, 968 P.2d at 784).  Addressing the first relationship,

7   the <u>Lozoya</u> court held the district court should have permitted a loss of consortium damages

8   claim to go to the jury, even though the accident that injured the consortium claimant's

9   spouse occurred prior to the time they were married, based on a factual demonstration

10  establishing an intimate familial relationship:  the consortium claimant and the injured person

11  had "been together" for over 30 years, had three children, had lived for fifteen years in a

12  house they had purchased, used the same last name, and filed joint tax returns.  That court

13  rejected arguments that a loss of consortium claim cognizable in relationships other than that

14  of married couples would "create an impractical and unworkable cause of action."  <u>Lozoya</u>,

15  66 P.3d at 957.  "This would only be true if this Court does not do its duty of providing

16  sufficient guidance to lower courts when determining when the claim should be allowed," and

17  adopting as "greatly helpful" the criteria articulated in <u>Dunphy v. Gregor</u>, 642 A.2d 372, 377

18  (N.J. 1994).  <u>Id.</u>  While acknowledging "a myriad of factors should be considered to

19  determine whether the relationship was significant enough to recover" (<u>Id.</u>), the <u>Lozoya</u> court

20  articulated several factors comprising the "intimate familial relationship" standard for

21  purposes of establishing a cognizable claim:

22              That standard must take into account the **duration** of the
              relationship, the degree of **mutual dependence**, the extent of
23              **common contributions to a life together**, the extent and
              quality of **shared experience**, and ... whether the plaintiff and
24              the injured person were **members of the same household**,
              their **emotional reliance** on each other, the particulars of their

25

26          [1]  "The courts have variously phrased this intangible loss to a parent or child as the loss of
    'aid, comfort, society, and companionship,' the loss of 'pleasure, society, comfort and
27  companionship,' or simply the loss 'of the family relationship.'"  It has been observed that today the
    term <i>consortium</i> 'is useful as a reference to benefits derived from any family member' and may be
28  used 'in the broader sense to describe the love, care and companionship of a parent, spouse, or
    child.'" 27 AmJurPOF 2d 393, § 1 (footnotes and citations omitted).

**day to day relationship**, and the manner in which they related
to each other in **attending to life's mundane requirements**.

Lozoya, 66 P.3d at 957 (emphasis added) (holding while "not everyone who is engaged to
be married, living together, or assuming the roles of husband and wife (common law or not)
will be entitled to recover" for loss of consortium, the facts of the relationship convinced that
court to recognize the right of that particular cohabitant to present a claim for loss of
consortium to a jury associated with the tort victim's demise, and identifying a "presumption
. . . in favor of [finding] a close familial relationship when the claimant can prove the
elements . . . of mutual consent to be married followed by a mutual assumption of marital
rights, duties or obligations," with consent to be "implied from the parties' acts or conduct,
and the usual civil burden of proof of preponderance of the evidence should apply"), *quoting*
Dunphy, 642 A.2d at 378.

As for the second type of relationship, the Fernandez court held a particular
grandmother, upon proof of her unique position as the family caretaker and provider of
parental affection to her twenty-two month old grandchild, could recover for loss of
consortium when the child died as a result of taking a negligently filled prescription
medication.  That court identified four factors that must be present before a compensable
relationship will be recognized between a familial caretaker and a child for purposes of
recovery of damages for loss of consortium:

> We hold that such foreseeability can exist where: (1) **the victim
> was** a **minor**; (2) the plaintiff was a **familial care-taker**, such as
> a parent or grandparent, **who lived with and cared for the
> child** for a **significant period of time prior** to the injury or
> death; (3) the child was seriously physically injured or killed; and
> (4) the plaintiff suffered **emotional injury** as a result of the loss
> of the child's companionship, society, comfort, aid, and
> protection.

Fernandez, 968 P.2d at 784 (emphasis added).

Other New Mexico authority elaborates the Solon test for finding an "intimate familial
relationship" adequate to satisfy the standard in other factual circumstances.  For example,
in Fitzjerrell v. City of Gallup, 79 P.3d 836, 840 (N.M. App. 2003), the Court of Appeals
traced the development of the cause of action and clarified its scope (citing, *inter alia*,

1  Romero, Fernandez, and Lozoya), to emphasize "the loss of consortium is a claim to recover

2  compensation for damage to a *relational* interest with a person, not a legal interest."

3  Fitzjerrell, 79 P.3d at 840.  "Loss of consortium is thus derivative of other injuries and not an

4  injury in and of itself."  Fitzjerrell, 79 P.3d at 840.  "Accordingly, a duty to a prospective

5  plaintiff springs only from the foreseeability of injury to that close and intimate bond."  Id.,

6  citing, *inter alia*, Solon, 829 P.2d at 648.  "The legal availability of relief depends on the

7  factual determination of whether a plaintiff has a significant enough relational bond with the

8  victim of a tort to recover for loss of consortium," characterized as one "sufficiently close and

9  intimate" with the victim.  Fitzjerrell, 79 P.3d at 840, *citing* Lozoya, 66 P.3d 948.

10      The Fitzjerrell court reversed the lower court's dismissal of the loss of consortium

11  claims by parents and siblings, as a matter of law from the face of the pleading, holding

12  dismissal was premature in the absence of any factual record.  Such family members are

13  not necessarily legally barred from asserting loss of consortium, if they can produce

14  evidence to show "that their relationships with Decedent was [*sic*] sufficiently close

15  financially, socially, or both, ***and*** if it was foreseeable that the injury to Decedent would harm

16  the relationships."  Fitzjerrell, 79 P.3d at 841 (emphasis added).  The Fitzjerrell court

17  succinctly summarizes the nature of a compensable loss of consortium claim and

18  substantiates the existence of a manageable standard against which to measure the unique

19  factual circumstances of consortium claimants:

20          In order to determine whether a claimant has a sufficiently close
           and intimate relationship with the victim, this Court should
21          consider several factors, including but not limited to:  **duration**
           of the relationship; **mutual dependence**; common contributions
22          to a life together; **shared experience**; living in the **same
           household**; **financial support and dependence**; emotional
23          reliance on each other; qualities of their **day to day
           relationship**; and the manner in which they related to each
24          other in attending to life's mundane requirements. . . . Lozoya's
           "mutual dependence" factors include[], in our view, **emotional,
25          physical, and financial support and dependence**.  Lozoya
           makes clear that a relationship that creates a compensable
26          interest is one that is intimate, protective, interdependent, and
           intertwined in functional (the way the people in the relationship
27          meet day-to-day situations together), financially interdependent,
           and temporal ways (spending time together **at least to the
28          extent of living together in the same household**). . . . When

added to the elements of the cause of action enunciated in <u>Fernandez</u>, ***these factors form a cogent picture of the legal requirements that are necessary to maintain a claim for loss of consortium.*** **It is clear that the purpose of this cause of action is** *not to compensate claimants for grief they suffer as a result of their own upset*, **but to compensate an injury to a relationship they shared with the injured or deceased person.** Loss of consortium is thus derivative of other injuries and not an injury in and of itself. . . . Accordingly, a duty to a prospective plaintiff springs from the foreseeability of injury to that close and intimate bond.

<u>Fitzjerrell</u>, 79 P.3d 836, 840-41 (emphasis added) ("The elements consisting of the qualities of the relationship that give rise to the claim are flexible in scope," so that the "legal availability of relief depends on the factual determination of whether a plaintiff has a significant enough relational bond with the victim of a tort to recover for loss of consortium").

The issue before this court is in a procedural posture different from that in the <u>Fitzjerrell</u> case. Plaintiffs here have had the opportunity to present an evidentiary record from which a reasonable jury could find the requisite "intimate familial relationship" and a duty imputable to the alleged tortfeasor adequate to warrant an award of damages. Applying Rule 56 standards to the evidentiary record presented, this court may determine whether Plaintiffs have carried their shifted burden to identify triable issues of material fact associated with the standard New Mexico applies to authorize loss of consortium damages recoveries and whether, on the record as a whole, a rational trier of fact could find in favor of the parties opposing summary judgment of those claims. *See* <u>Matsushita</u>, 475 U.S. at 586-87; *see also* <u>Anderson</u>, 477 U.S. at 250-251. If the facts of the particular relationship upon which the plaintiff sues reveal it was not sufficiently interdependent in functional, financial, and temporal ways to qualify as an "intimate familial relationship," this court is not persuaded it may not make that finding as a matter of law.

Plaintiffs and Defendant dispute whether the court may make a pre-trial determination as a matter of law whether a loss of consortium claim is compensable. That divergence appears to arise from observations in <u>State Farm Mut. Auto Ins. Co. v. Luebbers</u>, 119 P.3d 169 (N.M. App. 2005), *cert. quashed*, 146 P.3d 810 (2006) (construing an automobile insurance policy and holding a child's status as a four-week-old fetus at the time of his

1  father's death was not fatal to a claim for loss of parental consortium, on grounds the injury

2  in those circumstances was the inability to form any parental relationship, rather than the

3  loss of an established bond, and the difficulty of proving what type of parent his father was

4  likely to be affected only the potential value of the claim).[2]  The Luebbers court observed "[i]t

5  is better to allow the fact finder to assess the relative strength of the claims after a full factual

6  hearing" rather than for the court to create a "bright line rule" with respect to the timing when

7  a child's loss of consortium claim may become cognizable among very young infants or a

8  parent's pre-birth death.  Luebbers,199 P.3d at 180.

9  
10  
11  
12  
13  
> This approach mirrors the approach adopted by the [New Mexico] Supreme Court in Lozoya, in that it allows inquiry into the nature and quality of the relationship to determine **whether a claim is compensable** rather than relying on the existence of a particular legal relationship as a dividing point.  **The distinction  is that in this case we start with a recognized legal relationship** and allow the parties to litigate the value of the claims based on the likely nature of the relationship which was not allowed to come into existence.

14  Luebbers,199 P.3d at 180-81, 178 (an approach devised to accommodate "a classic

15  example of a temporal disconnect between a wrongful act and the injury it ultimately

16  causes"), citing Crumpton v. Gates, 9947 F.2d 1418, 1420-24 (9th Cir. 1991) (involving a

17  42 U.S.C. § 1983 claim by a son for the loss of his liberty interest in familial relations arising

18  out of the police killing of his father when he was a two-month-old fetus, construed by the

19  Luebbers court as analogous to a loss of consortium claim, because the loss "can only be

20  felt after birth when the plaintiff was unquestionably a 'person,'" noting "Crumpton held that

21  the child was permitted to recover and his cause of action did not accrue until his birth").[3]

22  

23  
24  
25  
-------

    [2]  The Luebbers court found "the viability of the fetus is not dispositive in cases of prenatal injury when the infant is born alive," and should also "not be dispositive in cases, such as the present one, where the alleged injury occurred after birth" [i.e., loss of ability to develop a parental relationship].  Luebbers, 119 P. 3d at 178 ("Thus, viability of the fetus at the time of injury to the parent should not be the dispositive issue in separating those children who may recover for loss of consortium form those who may not") (citation omitted).

26  
27  
28  
    [3]  "We acknowledge that fetuses pose a particular problem in the context of loss of parental consortium since the emotional aspect of the parent-child relationship is not allowed to be created if the parent dies before the child's birth. . . .  The injury here is the inability to form any parental relationship rather than the loss of an established bond.  We do not see this as fatal to the claim.  The issue is fundamentally one of factual proof.   Plaintiffs such as Brian Jr. have the burden of proving the nature and quality of the relationship lost.  Proof will necessarily be different for different

1    However, this court finds the <u>Luebbers</u> authority to be applicable to the unique

2   circumstance examined by that court, not implicated in any of the challenged loss of

3   consortium claims in these Motions. The <u>Luebbers</u> authority informs decisions related to that

4   unique circumstance:  *i.e.,* the injury was not the loss of an established relationship, but

5   rather the loss of an ability to form any parental relationship.  None of the challenged loss

6   of consortium claims in these Motions falls outside the scope of existing relationship analysis

7   examined from the perspective of the time of their decedents' deaths.  Unlike in <u>Luebbers</u>,

8   the recognition of a "legal relationship" is not presumed, but rather is the consortium

9   claimant's burden to prove before any damages valuation can legitimately proceed.

10   The <u>Luebbers</u> authority nevertheless does support the proposition a child's loss of

11   consortium of a parent is a cognizable cause of action separate from a wrongful death claim,

12   ***upon a proper factual showing of the requisite intimate familial relationship*** with that

13   parent at the time of the loss.  *See* <u>Luebbers</u>, 119 P.3d at 179 ("Given the development of

14   loss of consortium law in New Mexico," *citing, inter alia,* <u>Romero</u>, <u>Fernandez</u>, <u>Lozoya</u>, and

15   <u>Fitzjerrell</u>, the court held "upon the death of a parent, ***a minor child*** may pursue a separate

16   claim for loss of parental consortium outside of a wrongful death action") (emphasis added).

17   The <u>Lubbers</u> court clarified: "Brien Jr. may bring his loss of consortium claim separately, but

18   his damages are limited to the value to him of the loss of Father's love, care, society,

19   companionship, and the like," agreeing "with other jurisdictions that have 'awarded damages

20   for lost guidance and counseling independent of damages for loss of consortium or other

21   losses.'") <u>Luebbers</u>, 119 P.3d at 180 (citation omitted).  Defendant does not dispute loss of

22   parental consortium claims "have a place in [New Mexico's] tort jurisprudence," but only that

23   these plaintiffs cannot recover damages under that theory with respect to their particular

24   decedent parents or step parents.

25   \\

26

_____

27   children.  It could be that Brian Jr. will not be able to muster much admissible evidence as to the type
of parent Father was likely to be," although "such a difficulty should not defeat the claim as a matter
28   of law," but rather "only affect the potential value of the claim."  <u>Luebbers</u>, 119 P.3d at 180, citing,
*inter alia*, <u>Fitzjerrell</u>, 79 P.3d 836.

1     Unlike the Luebbers infant, all these plaintiffs had existing relationships the nature and

2   quality of which they must prove through evidence in support of facts to be measured against

3   the "intimate familial relationship" factors evolved by the New Mexico courts to gauge

4   whether the impact of the loss should be compensable in tort at all.  Loss of consortium

5   damages are not intended to "compensate claimants for grief they suffer as a result of their

6   own upset," such as their sorrow, lost future hopes, bittersweet memories, mental distress,

7   regrets or remorse the death forecloses for amendment, however foreseeable.  Fitzjerrell,

8   79 P.3d at 840-41.  Rather, entitlement to recovery depends on a demonstration of the

9   requisite actual relationships the claimants shared with their decedents at the time of death.

10     Plaintiffs argue the *quality* of their relationships with their decedents "must be

11   established by evidence at trial" (Lamphere Opp. P&A 4:17-18), and those claims

12   necessarily involve "peculiar and unique facts . . . not amenable to any set formula nor can

13   the claim be subject to a fixed set of factors" for evaluating the relationships (Lamphere Opp.

14   P&A 9:1-4).  The court does not *find facts* in deciding whether an issue must be summarily

15   adjudicated for failure of an opposing party to carry its burden.  Defendant here adequately

16   shifted the burden to plaintiffs to produce evidence creating a triable issue of material fact

17   on the requisite relationship based on which a reasonable jury could award them damages

18   for loss of consortium.  While not required to prove their case at this stage in the

19   proceedings, plaintiffs must nevertheless produce some evidence to persuade the court a

20   rational trier of fact could find in their favor on the issue under controlling law.

21     In consideration of the authority discussed above, the court rejects Plaintiffs' argument

22   New Mexico has no legal test for relationships which may give rise to a right to recover for

23   loss of consortium.  *See, e.g.*, Lamphere Opp. pp. 4-10.  Plaintiffs appear to dispute New

24   Mexico decisional law would ever permit the court to summarily adjudicate the issue due to

25   the variety and "fact driven" nature of loss of consortium claims, arguing:  "[t]here is no set

26   rule that applies across the board; the factors for consideration by a trial Court are based

27   upon the unique facts and relationships of the loss of consortium claimants with the victim."

28   Opp. 20:16-18.  However, the "fact-driven" nature of the analysis is accommodated by

Rule 56 standards, describing the respective evidentiary burdens of the parties moving for and opposing summary adjudication as a matter of law and instructing the court to summarily adjudicate factually unsupported claims or defenses.  The "relationship[] of the loss of consortium claimant[] with the victim" is precisely the showing necessary to raise a triable issue of material fact on the required element of an "intimate familial relationship," as differentiated from other close family relationships.  When objective behavior substantiated in the evidentiary record establishes on its face the interactions and conduct of the consortium claimant and the decedent fall short of the indicia of "intimate familial relationship," as elaborated in the case law defining that tort for purposes of recovery of damages for a parent's, child's, or sibling's loss of the decedent's society or support essential to a finding of liability, this court concludes the quality of the relationship need not be tried to a jury because the claimant cannot recover damages under that theory as a matter of law.  The jury's job is to value the loss to consortium claimants of those "intimate familial relationships" recognized as compensable losses.  Absent a showing of triable issues of material fact whether the requisite relationship existed to support a potential recovery of damages, the court may find as a matter of law the legal standard cannot be met.

In this case, each of the consortium claimants had a pre-existing relationship with their decedents, and an evidentiary record exists as to their actual connections and interactions with their decedents against which the elements of the "intimate familial relationship" showing can be compared.  If that threshold is not met, in this court's view an essential element of a compensable loss under that legal theory is absent, precluding litigation of the value of the claim.  The "likely nature of the relationship" question in the Luebbers-type case, supporting a presumption of a potentially compensable claim, is replaced here by *actual* relationships the nature of which plaintiffs must substantiate.  While Plaintiffs are correct a court applying Rule 56 standards may not *find* facts, the court must grant summary judgment where parties with the burden of truth at trial fail to identify facts from which a trier of fact could find in their favor on the issue.  Plaintiffs bear the burden of proof on all the loss of consortium claims.  Unless they demonstrate trial of the claims is warranted, the issue of

1   valuation of damages predicated on the existence of a viable claim does not arise.  The court
2   finds it can decide these Motions as a matter of law in consideration of all the facts
3   supported by the relevant evidence presented, applying New Mexico law defining the factors
4   controlling potential recovery for loss of consortium.  Merely because loss of consortium
5   claims are of a "fluid and fact-dependent nature" (Lamphere Opp. 10:2) does not remove
6   them from the scope of Rule 56 review before trial.

7   **III.    MERITS**

8          The material facts are essentially undisputed.  The motion papers elaborate the
9   parties' differing constructions of how the facts should be characterized in consideration of
10  factors New Mexico common law has evolved to inform the question whether the nature of
11  the relationship of each consortium claimant with his or her decedent rises to the requisite
12  level of interdependent intimacy to warrant submitting the claim to a jury for recovery of
13  damages.  The court decides each Motion in consideration of the essential elements for
14  recovery of damages for loss of consortium:  (1) a factual demonstration of a sufficiently
15  intimate familial relationship between the particular claimant and the decedent existing at the
16  time of the death; and (2) the existence of a duty owed by the defendant to the plaintiff, to
17  be determined as a matter of law.  *See e.g.*, <u>Lozoya</u>, 66 P.3d at 957.  While in no way
18  intending to minimize their grief and bereavement, for the reasons discussed below, the
19  court finds none of the plaintiffs targeted by Defendant's Motions has demonstrated the
20  degree of "intimate familial relationship" with his or her decedent from which a reasonable
21  jury could award them tort damages for loss of consortium.

22         In reviewing the evidence under Rule 56 standards, the court draws the reasonable
23  inferences from the evidence presented each of the loss of consortium plaintiffs cared very
24  much for their decedent, and experienced sincere grief, sorrow, and bereavement at his loss.
25  Nevertheless, the court must winnow the Opposition facts relevant to the factors required to
26  establish the requisite "intimate familial relationship" at the time their decedent died from
27  facts describing historical relationships or projections of future circumstances in which the
28  decedent's presence will be missed.  The court evaluates the extent of mutual support,

1   interdependence, and the like as they existed at the time of death in each claimant's
2   individual relationship to his or her decedent as informing the determination whether each
3   lost a relationship potentially compensable under a loss of consortium theory.

4           **A.      Lamphere Plaintiffs**

5           The Lamphere plaintiffs are Tammie Lamphere, the wife and personal representative
6   of the estate of decedent Kristopher John Lamphere, a 30-year-old professional pilot at the
7   time of his death, and his heirs, identified in addition to his wife as his two stepchildren, his
8   brother, his three sisters, his father, and his mother.   FAC ¶ 11.  Defendant seeks summary
9   adjudication of the loss of consortium claims only as to the individual claims of:   Mr.
10  Lamphere's parents, Richard and Lavonne Lamphere; his sisters Kristin Ferris and Kathleen
11  A. Attia-Alla; and his stepdaughters, Brianna Chacon and Marissa Chacon.   Dkt No. 49.
12  Defendant argues the undisputed facts show the requisite relationship did not exist between
13  the decedent and any of those plaintiffs, so that their individual claims must fail as a matter
14  of law.  Those plaintiffs oppose the Motion, contending they have adequate factual support
15  to sustain their loss of consortium claims and genuine issues of disputed material fact
16  preclude summary adjudication.  Opp. 3:11-13.

17          Many of the facts provided to oppose summary adjudication furnish only context,
18  narrative descriptions of plaintiffs' personal histories, or character traits of their decedent,
19  frequently pre-dating by many years the pertinent time period of Mr. Lamphere's October
20  2004 death from which the court (applying Rule 56 standards) or any eventual factfinder
21  (applying preponderance of the evidence standards) must judge the adequacy of the
22  evidentiary showing.  Likewise, representations regarding the naturally distressing emotional
23  effects of the loss of their decedent do not advance the required showing.   Opp. pp. 13-19.

24          **1.      Parents**

25          The undisputed evidentiary record before the court substantiates that in October
26  2004, Mr. Lamphere's parents resided in Albuquerque, New Mexico, but lived separately
27  from their son.  Mr. Lamphere, aged 30 years at the time of his death, had moved to
28  Albuquerque in 2002 for a job opportunity after serving in the Air Force.   He had not lived

with his parents since 1992, with the exception of the month prior to his June 2004 marriage, before moving in with his wife and her young daughters.  His parents had lived in North Dakota, Nebraska, and Colorado in the years since their son left the family home after high school, while he had lived primarily in other states.  Until 1997, he had shared an annual trip with his father, enjoying fishing, hunting, skiiing, snow mobiling, and flying together.

Mr. Lamphere saw his parents several times a week when they all resided in Albuquerque, including with his new wife after their marriage.  The two couples went to church together.  Mr. Lamphere helped his parents make decisions and assisted around their house due to his father's heart condition, which prevented him from engaging in any strenuous activity.  They spoke on the telephone almost daily.  Mr. Lamphere's companionship was a source of comfort and emotional support for both his parents. Mr. and Mrs. Lamphere received no financial support from their son nor he from them.  Since his death, his parents suffer from depression, anxiety, insomnia, loss of appetite, and weight loss.  They regret their son never had his own child, something he badly wanted.  As loving parents of a loving son, their lives are naturally forever changed by his loss.

In consideration of the evidentiary record presented, the court finds no genuine issue of material fact emerges to support the requisite interdependence essential to establish the "intimate familial relationship" prerequisite to recovery  by parents of a decedent for loss of consortium foreseeable by a tortfeasor.  Mr. Lamphere was an adult, not a minor child.  He had not shared a household with his parents for any significant duration in the twelve years preceding his death.   He did not contribute to their financial support.  The nature of the interdependence as it emerges from undisputed facts cannot reasonably be construed as other than that typically shared by fond family members who reside in the same vicinity. The Lampheres have identified no unique circumstance from which a reasonable factfinder could differentiate their relationship with their adult son at the time of his death from that of any other similarly situated family.   The Motion for summary adjudication of the loss of consortium claim in Defendant's favor is accordingly **GRANTED** with respect to Richard and Lavonne Lamphere.

06CV2174

1          2.    **Siblings**

2          Kristin Ferris is Mr. Lamphere's older sister, but closest to him in age of all the

3    siblings.  They both lived in the family home until she moved out to attend college locally in

4    1988, but they maintained daily contact until he graduated from high school in 1992 and

5    moved away to serve in the military.  Thereafter, she and he spoke on the phone at least

6    once a month and exchanged cards.  Ms. Ferris wishes she could have seen her brother

7    more, but the geographical distance and financial burden of traveling limited such visits.  She

8    saw Mr. Lamphere three times in the five years preceding his death.  She has since had

9    trouble sleeping and has nightmares about the air crash.

10         Kathleen Attia-Alla is another older sister, sixteen years her brother's senior, and the

11   eldest child at home during his early childhood.  She lived in the Lamphere family home until

12   she moved away to attend college in 1980, but saw her brother on her visits home from

13   college almost every weekend, as well as on holidays or at family gatherings until he moved

14   away in 1992.  She would talk with him about his career goals, and they exchanged news

15   of each other's lives and interests after both were grown and out of the house, talking on the

16   phone at least once a week and exchanging e-mail.  Ms. Attia-Alla visited her brother in

17   California for ten days in 2002.  She saw him two times in the five years preceding his death.

18         Both these consortium claimants lived in North Dakota at the time of the accident.

19   Neither shared a household with Mr. Lamphere.  Neither received financial support from him.

20   Both attest to an emptiness created in their lives by the death of their brother, and their

21   sadness at holidays and birthdays without him.   Nevertheless, the court finds by no

22   reasonable inference from the evidence presented could it be found Mr. Lamphere and

23   either sister shared uniquely intertwined lives of a quality or nature adequate to support

24   recovery under a loss of consortium theory.  They evince none of the factors found by New

25   Mexico courts to warrant recognition of a separate tort theory of recovery and attribution of

26   a duty to a tortfeasor to compensate either of them for the loss of the relationship.  Their

27   evidence describes no more than a fond relationship between independent adult siblings.

28   The evidence identifies no particular circumstance from which a reasonable factfinder could

differentiate their relationships with their brother at the time of his death from that in any other similarly situated family.   The Motion for summary adjudication of the loss of consortium claim in Defendant's favor is accordingly **GRANTED** with respect to Kristin Ferris and Kathleen Attia-Alla.

### 3.   Step-Children

The undisputed facts establish Briana Chacon and Marissa Chacon met Mr. Lamphere in February 2003, before he began dating their mother.  They lived with him and their mother for four months, from the time of their marriage in June 2004 until the October 2004 accident.  Briana was born in May 1993, and Marissa was born in May 1991.  Their parents had divorced in 2001, with both natural parents maintaining joint custody.

Briana's and Marissa's declarations substantiate adjustment problems not unusual from stepparent/stepchild frictions, but which were being resolved as the girls resolved their initial fears Mr. Lamphere might be trying to take their father's place.  They participated in blended family counseling to help them overcome their anger at their parents' divorce and to help them understand their growing relationship with Mr. Lamphere in his role as stepfather.  They took vacations together.  He was very kind to them and was fun to be with.  They appreciated his love for their mother.  He helped them with homework and did things with them such as cooking and swimming and gave them emotional support, despite their early antagonism toward him.  After Mr. Lamphere's parents moved to Albuquerque in the summer of 2003, the girls also spent a lot of time with their step-grandparents.

Briana experienced shock at the news of the air crash.  She feels her relationship with her stepfather was cut short, with a big part of her life just beginning then suddenly taken away.  Marissa feels bad for not spending more time getting closer to her stepfather and for not always treating him as nicely as he treated her.  She regrets the time she wasted being stubborn, and feels a big hole in her life without him.

The court finds, by any frame of reference, the four-month duration of the shared household relationship allegedly giving rise to a loss of consortium claim by Mr. Lamphere's stepchildren was too short to persuade any reasonable factfinder the requisite intimate and

interdependent relationship had been established. Rather, undisputed facts demonstrate the girls' primary caretakers and objects of their emotional dependency continued to be mother and their biological father, who shared joint custody of them and to whom the girls looked for companionship, society, comfort, aid, and protection rather then to their stepfather, to whom they were admittedly slow to warm. There is no evidence of any plans to alter that arrangement or for Mr. Lamphere to adopt his wife's daughters.

Plaintiffs do not refute "no reported case in New Mexico has ever dealt with a claim for loss of consortium by a stepchild." Mot. P&A 5:10-11. Defendant identifies Luebbers as the one reported case in New Mexico to recognize a claim for loss of consortium by a biological child. The court distinguishes that case above as predicated on a unique circumstance in the loss of consortium context requiring a modified recovery theory, because it dealt with the loss of an *opportunity* to have *any* relationship with a parent killed before the child's birth rather than applying the analysis to characterize an *existing* relationship under the legal standard for finding an "intimate familial relationship." That court *presumed* the existence of an "intimate familial relationship," whereas here the court must determine *whether* these consortium claimants have any evidence from which such a finding could be made. The Luebbers court fashioned a remedy in reliance on the *legal* relationship between a child unborn at the time of his father's death, rather than performing the usual analysis to identify the presence or absence of factors suggesting the requisite relationship existed between the consortium claimant and the decedent. The court is unpersuaded by plaintiffs' attempt to save this claim in reliance on Luebbers. No legal relationship through formal custody or adoption existed between the Mr. Lamphere and his stepdaughters. With respect to the intimacy and caretaker factors, the evidence is insufficient to create a triable issue of fact these minor children looked primarily to Mr. Lamphere for such support. Their mother worked, and the children were not financially dependent on him rather than on their biological parents.

In addition to Mr. Lamphere's step-daughters' loss of consortium claim, the FAC also asserts a claim for "lost guidance and counseling" on their behalf. A minor's lost guidance

and counseling "is a pecuniary injury under the [Wrongful Death] Act," and such damages are to be included as part of the value of the decedent's survivors under the Act. Romero, 872 P.2d at 847.  The Romero court recognized a cause of action by a minor child for loss of parental guidance and counseling as part of a claim for loss of spousal consortium, noting "the cause of action by a minor child for loss of guidance and counseling has not been considered by this Court, because the basis for the action was seen as rooted in loss of consortium." Id., at 842.  However, the Luebbers court acknowledged Romero did not limit children to a remedy under the Wrongful Death Act and "did not bar an independent cause of action for loss of parental consortium as such." Luebbers, 119 P.3d at 180 (distinguishing the type of damages a minor child can pursue outside a true wrongful death action, eliminating any pecuniary damages under a loss of consortium/loss of guidance theory for the parent's medical expenses, pain and suffering, lost earnings, or the value of the parent's life), quoting Romero, 872 P.2d at 846.

Plaintiffs do not refute Defendant's contention New Mexico has not dealt with a claim by a stepchild for lost guidance and counseling, coming closest in Otero v. City of Albuquerque, 965 P.2d 354 (N.M. App. 1998).  The Otero, court made recovery under that theory contingent upon proof of legal or equitable adoption.[4]  Mr. Lamphere's stepchildren attempt no such showing, nor can any reasonable inference be drawn they could conceivably prove the requisite relationship with him in consideration of their on-going relationship with their biological father.  The Motion for summary adjudication of the loss of consortium and loss of guidance and counseling claims in Defendant's favor is accordingly **GRANTED** with respect to Briana and Marissa Chacon.

### 4.    The Lamphere Plaintiffs Have Not Carried Their Rule 56 Burden

In summary, drawing all reasonable inferences in their favor, the court finds none of the Lamphere consortium claimants targeted in Defendant's Motion has carried his or her

---

[4]   Defendant also argues the New Mexico Wrongful Death Act requires that a decedent have adopted the minor children, statutorily or equitably, in order for them to be able to state any damages claim. N.M. STAT. § 41-2-1.  No statutory claims are before the court on these Motions, and the court expresses no opinion on that issue.

burden to defeat summary adjudication of that tort claim under New Mexico law. Defendant demonstrates, as a matter of law on undisputed facts, at the time of the accident none of them had a sufficiently intimate familial relationship with their decedent to recover damages under that theory. Moreover, the court is not persuaded by any of the showings Defendant reasonably can be found to have had a foreseeable, actionable duty towards the parents of a 30-year-old man with whom he had not shared a household for more than a decade prior to his death, or to geographically distant adult siblings, or to his stepchildren of four months duration who remained emotionally, financially, and legally dependent upon their biological father and mother. Plaintiffs produce no evidence from which a reasonable jury could find the social interactions or the financial support Mr. Lamphere provided to any of them either existed or surpassed the normal familial interactions to be expected in any similar family units among themselves. Under this court's reading of New Mexico authority, it is insufficient to sustain a loss of consortium claim based solely on an allegedly "strong, caring, emotional bond." *See* Opp. 20:3-5. In the absence of evidence of at least some of the factors used to demarcate a loss of consortium claim actionable as a tort from emotional distress and grief associated with the death of a loved one, the court finds Defendant's Motion must be **GRANTED** with respect to the targeted claims of these <u>Lamphere</u> plaintiffs. The court of course expresses no opinion on the issues associated with these plaintiffs' Wrongful Death theories nor their potential for recovery of damages under any other FAC theory.

### B.   Womble Plaintiffs

The applicable law and reasoning the court applied in deciding the <u>Lamphere</u> Motion apply equally to the loss of consortium claims of the parents and stepchild of decedent Donald Womble, Jr., who was 45 years old when he perished in the plane crash. The necessarily idiosyncratic factual underpinnigs of each individual claimant's relationship to his or her decedent, including those of Mr. Womble's own children, are addressed separately below to support the result. The court again perceives from the factual record presented each of the <u>Womble</u> plaintiffs targeted by the Motion cared very much for their decedent, and experiences sincere grief, sorrow, and bereavement at his loss.

### 1.    Parents

Consortium claimants Donald Womble, Sr. and Jeanne Womble are the parents of Donald Womble, Jr., their decedent.  As pertinent here, it is undisputed he resided in Edgewood, New Mexico, a suburb of Albuquerque, from 1995 until the 2004 accident.  His parents lived in Albuquerque.  He had lunch with his father at least once a month.  Mr. and Mrs. Womble testified they taught their son to be independent, and he moved out of their house to focus on his career when he became an adult.  They characterize their relationship with him at the time of his death as "loving and supportive."  Decl. D. Womble, Gilman Exh.3; Decl. J. Womble, Gilman Exh. 2.  They describe their responses to his death as causing grief, anxiety, insomnia, depression, worsening medical conditions, and loss of the comfort of having him there for their elderly years, as well as loss of the opportunity to fully repair their relationship with him.

Mrs. Womble describes their relationship with their son as "in a state of repair" at the time of his death, due to some tension that had developed during a period of his involvement with an ex-girlfriend before he married Laura Womble, his second wife.  J. Womble Decl., Gilman Decl. Exh. 2 p. 3.  Mr. Womble, Jr. apparently did not invite his parents to his small second wedding, and they did not attend.  Defendant relies on Mrs. Womble's deposition in support of the facts:  she had never met Laura Womble; her son never visited his mother, and spoke with her only a few times a year; she could not remember the last time she visited with him nor how long it took to drive from her house to his.  J. Womble Depo. pp. 20-26, Fowler Decl. Exh. I.  Defendant highlights the absence of any financial interdependence between the Wombles and their decedent, the infrequency of personal visits despite living in the same area, and the absence of a shared household and daily experiences as defeating a threshold showing of "intimate familial relationship" required for recovery of damages under a loss of consortium theory.  Defendant argues the absence of cohabitation, absence of dependence on their son for material or personal assistance, lack of mutual dependence or common contribution to a life together with him eliminates the foundation for any compensable loss of consortium claim.

06CV2174

1    Leaving aside the details about their relationship during Mr. Womble, Jr.'s childhood

2  and young adulthood as not informative of the nature or quality of the relationship at the

3  relevant time period, the court finds Mr. and Mrs. Womble fail to carry their shifted burden

4  on summary judgment to create a genuine issue of disputed material fact to save the claim.

5  They advance the same argument as the other consortium claimants in their Motions, *i.e.*

6  "the <u>fact</u> that Plaintiffs lost their [decedent] is subject to ruling as a matter of law.  However,

7  the <u>quality</u> of the relationship between the Plaintiffs and [their decedent] must be established

8  by evidence at trial." Opp. 4:18-21, *citing* <u>Luebbers</u>, 119 P.3d 169.  The court has construed

9  that case as distinguishable from the loss of consortium claims at issue in these Motions.

10  In addition, as discussed elsewhere in this ruling, summary judgment standards do not

11  preclude a decision on the bare ground that particularized facts must be considered in

12  deciding the Motions.  The Motion for summary adjudication of the loss of consortium claim

13  in Defendant's favor is accordingly **GRANTED** with respect to Donald Womble, Sr. and

14  Jeanne Womble.

15              **2.      Natural Children**

16    Consortium claimants Donald Womble, III and Kristin Womble are the biological

17  children of the decedent from his first marriage, to Stacey Gardener.[5]  Undisputed Fact Nos.

18  12, 13.    Donald III was born in January 1989.  Kristin was born in December 1986.  Mr.

19  Womble, Jr. and Ms. Gardener divorced in July 1995.  Their parents shared legal custody

20  after the divorce.  The undisputed facts establish Donald III and Kristin lived with their father

21  full time in New Mexico from July 1995 until December 1999, the three and one-half years

22  after their parents' divorce.  They visited their mother and half-sister, Amber Straubing (the

23  decedent's stepdaughter during his marriage to Ms. Gardener) every weekend while they

24  lived in Amarillo, Texas.  Donald III and Kirstin moved in with their mother full-time in 1999

25  when their father started paramedic school and began sharing an apartment with a family

26

27          [5]   The court assumes the Kristin Womble Declaration contains an error where it states: "I
28  never had any desire to meet my biological father.  Donald Womble, Jr. was my dad.  No one else
    could or ever can replace him.  He even talked about legally adopting me." K. Womble Decl. p. 3,
    Gilman Decl. Exh. 7.

1   friend to save money.  They never lived with their father again.  Their mother remarried.

2   Donald III and Kristin lived with their mother and their stepfather, Robert Gardener, after

3   1999.  Kristin characterizes the relationship with their stepfather as good.   He paid the

4   household bills and gave them emotional support.  K. Womble Depo. p. 18, Gilman Decl.

5   Exh. 6.  They moved to Illinois with their mother and stepfather.   They visited their father

6   thereafter during school vacations and for holidays, three or four times a year.  Depo. D.

7   Womble, III, Fowler Decl. Exh. K and Gilman Exh. 4; Decl. D. Womble, III, Gilman Decl. Exh.

8   5; Depo. K. Womble, Fowler Decl. Exh. L and Gillman Exh. 6; Decl. K. Womble, Gilman

9   Decl. Exh.  6.

10      Mr. Womble, Jr. invited his children to move back to Albuquerque in 2002, when he

11  married his second wife, Laura, but the teenagers preferred to stay in Chicago where they

12  had become involved, although they characterize their relationship with their father as very

13  good despite the distance.  He discussed with them how much money they needed for

14  school and clothes, and would reimburse their mother for half their expenses.  He also sent

15  money to the children for birthdays and holidays.  Gardener Decl., Gilman Decl. Exh. 10.

16      Donald III spoke with his father two to four times a month, using a webcam so they

17  could see each other. D. Womble, III Decl. 2:16-18.  He declares they discussed his school

18  and future plans, and he received guidance and comfort from him.  His father planned to

19  help him with college tuition and living expenses.  They visited the military academy in New

20  Mexico in 2001 together, in preparation for his joining the Air Force.  He describes an effect

21  of his father's death as his no longer having a father to turn to when making tough decisions.

22  D. Womble III Decl. pp. 3-4.

23      On undisputed facts, the court finds neither of Mr. Womble, Jr.'s consortium claimant

24  children shared a daily interdependence with him, financially or socially, and he had not had

25  physical custody of his children nor had he served as their primary caregiver for many years

26  before the accident. Those circumstances foreclose a finding of duty based on foreseeability

27  of the type of injury to these plaintiffs contemplated by New Mexico's test for "intimate

28  familial relationship" on the part of a potential tortfeasor.  *See* Fernandez, 968 P.2d at 784.

1 | The Motion for summary adjudication of the loss of consortium claim in Defendant's favor
2 | is accordingly **GRANTED** with respect to Donald Womble, III and Kristin Womble.

3 | ### 3.    Step Child

4 | Consortium claimant Amber Straubing is the child of the decedent's former wife,
5 | Stacey Gardener.   The discussion of stepchild status associated with the legal analysis of
6 | the Chacon consortium claimants, above, applies equally to this plaintiff.  She was about
7 | three years old when Mr. Womble, Jr. married her mother.  Sometime in 1992, when she
8 | was about 10 years old, her mother and stepfather decided it would be best for her to live
9 | with her grandmother in Amarillo, Texas to attend school.  After her divorce from the
10 | decedent, Ms. Gardener also moved to Amarillo and remarried. Mr. Womble, Jr. never
11 | adopted Amber, but she testified she did not know he was not her biological father until she
12 | was 8 or 9 years old when such discussions came up.  Straubing Depo. p. 16, Decl. p. 2;
13 | Gilman Exhs. 8, 9.  She never knew her biological father and considered her stepfather to
14 | be her dad.  Straubing Decl. p. 2.

15 | Amber had not lived with the decedent since 1992.  From 1992 until 1995, she spent
16 | school vacations in New Mexico with her family, including her stepfather, and they visited her
17 | on weekends.  She also saw him on weekends thereafter, until 1998 or 1999 when she
18 | moved with her mother, stepfather, and siblings to Chicago.  After the move to Chicago, she
19 | did not accompany Donald III and Kristin when they visited their father in New Mexico.  She
20 | not seen him in the five years before his death.  She declares she spoke with him two or
21 | three times a week by phone and webcam and testified they discussed her moving back to
22 | Albuquerque to live near him.  He helped pay her expenses.  They spoke of her future plans
23 | and goals for her career, of which he was very supportive.  He intended to help with her
24 | college tuition and living expenses, and wanted her to finish college.  Straubing Decl. pp. 3-4.
25 | Amber was nearly twenty-two when her stepfather died, as calculated from her December
26 | 1982 birth date and the October 2004 plane crash.  She describes the effects of his loss as
27 | increased anxiety, interfering with her ability to go anywhere, including to work.  After the
28 | accident, she was not able to sleep and still dreams about him.  Straubing Decl. p. 4.

1      This court finds, on undisputed facts, Amber cannot possibly prove the mutual

2 dependence or day-to-day relationship of the kind necessary for her to prevail under a loss

3 of consortium theory of recovery applying New Mexico law, leaving aside the absence of

4 adoption. The Motion for summary adjudication of the loss of consortium claim in

5 Defendant's favor is accordingly **GRANTED** with respect to Amber Straubing.

6          **4.**    **The Womble Plaintiffs Have Not Carried Their Rule 56 Burden**

7      As noted by Defendant, the <u>Womble</u> Plaintiffs "do not allege any facts to show that

8 their relationships were any more intimate than the typical relationship between a parent and

9 an adult child, or a parent and child who live thousands of miles apart." Reply 2:25-28. The

10 court concurs with Defendant: to find genuine issues of material fact requiring resolution by

11 a fact-finder on this evidentiary record, the court would have to expand New Mexico

12 impermissibly to conclude that state's loss of consortium cause of action/theory of recovery

13 extends to anyone claiming "the loss of opportunity to develop the relationship which might

14 have been." Reply 3:1-4, *quoting* Opp. 9:9. The court must concur the relationships those

15 plaintiffs describe "were not intimate, protective, interdependent, or intertwined in functional,

16 financially interdependent and temporal ways." Mot. P&A 8:1-3. The absence of familial

17 caretaking associated with a minor child (*see* <u>Fernandez</u>), and the failure to satisfy any of

18 the criteria discussed in <u>Lozoya</u> or <u>Fitzjerrell</u> preclude as a matter of law the potential for

19 them to recover under a loss of consortium theory. None of these plaintiffs demonstrates

20 he or she was making "common contributions to a life together" with their decedent. Reply

21 10:4-9. Plaintiffs' proffered explanations for the status of their relationships with their

22 decedent at the time of his death (*i.e.,* living in separate households, geographical distance,

23 in the process of repairing the relationship, and the like) cannot substitute for the existence

24 of a contemporaneous "intimate familial relationship," absent which, irrespective of the

25 reasons the relationships were insufficiently intimate, the claim cannot proceed.

26         **C.**    **Larson Plaintiffs**

27      Raymond and Gladys Larson are the parents of Laura Womble, who perished in the

28 airplane accident at the age of 47 years along with her husband, Donald Womble, Jr. In

1    reviewing the evidence under Rule 56 standards, the court draws the reasonable inferences

2    each of them cared very much for their daughter, and experiences sincere grief, sorrow, and

3    bereavement at her loss.

4            Defendant argues the Larsons can produce no evidence that their relationship with

5    Ms. Womble "rose to the level of intimacy and inter-dependence required by New Mexico law

6    to recover loss of consortium," warranting summary adjudication of that claim in its favor as

7    to those plaintiffs.   Mot. P&A 2:20-23.    Defendant argues certain fundamental factors

8    essential to the requisite "intimate familial relationship" showing did not exist between Ms.

9    Womble and her parents at the time she died.  In particular:  the Larsons did not share a

10   household or daily experiences with their adult daughter and, in fact, had lived in Florida for

11   the 24 years preceding this action, while Ms. Womble lived in Ohio and New Mexico; she

12   and her parents had no financial interdependency; Ms. Womble visited her parents in Florida

13   at least once a year for vacations after she married her first husband, and her children also

14   visited them; Mr. Larson had met his daughter's husband only twice in the two years they

15   were married before the accident, and Mrs. Larson had met him three times; and their

16   interactions with Ms. Womble were primarily telephonic, with no day-to-day interactions for

17   over two decades, although Ms. Larson spoke on the telephone with her daughter about

18   twice a week in conversations lasting an hour or more, sharing details of their lives.  *See* G.

19   Larson Depo., Fowler Decl. Exh. N; R. Larson Depo., Fowler Decl. Exh. P; *see also* Joint

20   Statement of Undisputed Facts.   Again, the court must winnow relevant facts from the

21   extensive narrative of historical examples and descriptions provided of Ms. Wombles' life and

22   the Larsons' natural feelings for their daughter and hers for them in order to determine

23   whether they carry their burden to raise a triable issue of material fact.[6]

24   _____

25        [6]   The Larson declarations offer such observations as:   her father, a minister, married her
     to her first husband; Ms. Larson and Ms. Womble were discussing the possibility Ms. Womble and
26   her family might relocate to Florida to be near her parents, and they were exploring housing and
     employment options there; Ms. Womble had always been a "thoughtful child," remembering special
27   days with gifts; mother and daughter enjoyed spending time together when they visited and shared
     interests; Ms Larson visited Ms. Womble to help out when her first child was born and shared a
28   bonding experience; and Ms. Womble was the sibling who organized vacations after the Larson's
     children were grown to keep them all in touch.

1    In Opposition, the Larsons argue New Mexico has rejected any "bright line test based
2   upon the legal status of the parties to the relationship" in deciding loss of consortium claims,
3   in reliance on Lozoya, 66 P.3d 948.   Opp. 7:26-28.   This court's understanding of the
4   authority elaborating the elements required for recovery under a loss of consortium theory
5   under New Mexico common law appears above.   The court declines to interpret that
6   authority as so fluid that a fact-finder must always decide the nature of the relationship.  The
7   Larson's Rule 56 Opposition obligation was to produce evidence from which a reasonable
8   factfinder could determine the existence of at least one of the indicia essential to a finding
9   of an "intimate familial relationship" shared with their daughter at the time of her death.

10    The Larsons have lost the comfort of knowing their daughter would be around as they
11   aged, and their grief at her lost has manifested in feelings of numbness, difficulty accepting
12   she is actually gone, a void and loneliness and fear of future loneliness without her, difficulty
13   sleeping, and the like.  Opp. pp. 12-15.  They summarize:  "Gladys and Raymond Larson
14   may not have lived with Laura Womble, but they maintained a strong, caring, emotional bond
15   with their daughter, and the loss to these parents by the death of their daughter has been
16   extreme." Opp. 16:5-8.  The natural indicia of grief and sorrow, no matter how sincerely and
17   profoundly felt, standing alone, are not compensable injuries under a loss of consortium
18   theory under New Mexico law. These plaintiff parents point to no evidence from which a
19   reasonable fact finder could conclude the nature of their relationship with their adult
20   decedent was one of daily financial or social interdependence, or otherwise rose to an
21   unusual level of intimacy distinct from any good relationship among grown children and their
22   affectionate but geographically distant parents.

23    The court finds, applying the factors summarized in the legal standards section above
24   necessary to sustain a loss of consortium claim by parents of adult children who share no
25   financial, domicile, or caregiving interdependence, neither of the Larson plaintiffs raises a
26   triable issue of material fact warranting fact-finding by a jury with respect to the "intimate
27   familial relationship" nature of their connections to Ms. Womble at the time of her death.  As
28   \\

1   a matter of law, these plaintiffs cannot prevail on the claim.   Defendant's Motion is

2   accordingly **<u>GRANTED</u>** as to the Larsons' loss of consortium claim.

3       **D.**   **<u>Kolb Plaintiff</u>**

4       Brett Kolb is the adult son of Karl Kolb, a professional pilot living in Albuquerque, New

5   Mexico at the time of the accident.  Karl Kolb perished in the plane crash at the age of 56

6   years. The court does not doubt Brett Kolb, like the other consortium claimants, cared very

7   much for his father and experiences sincere grief, sorrow, and bereavement at his loss.

8       Defendant argues Brett Kolb cannot establish his relationship with his father at the

9   time of his death rose to the level of intimacy required by New Mexico common law to

10  recover loss of consortium damages, warranting summary adjudication of that claim in its

11  favor.  In particular, Defendant argues Brett Kolb "must prove he shared a household and

12  daily experiences with the decedent" in order to prevail on his loss of consortium claim, and

13  the undisputed facts demonstrate he cannot do so.  Defendant relies on the deposition of

14  Linda Kolb, the decedent's wife and plaintiff's mother, for the facts:  Brett Kolb was 22 years

15  old at the time his father died; he lived in a different state; when his parents moved to New

16  Mexico in 2002, he stayed behind and lived independently in Billings, Montana; and  he had

17  not lived with his parents for about two years prior to the accident.  L. Kolb Depo. pp. 15-16,

18  40, Fowler Decl. Exh. Q; Undisputed Facts 1-4.

19      In his Opposition, Brett Kolb substantiates other facts he contends preclude summary

20  adjudication of his loss of consortium claim.[7]  In particular, he declares:  his parents sold

21  their Billings, Montana home and relocated to Santa Fe, New Mexico in June 2002, when

22  his father accepted a pilot's job there; Brett remained in Billings to attend Montana State

23  University as a full-time student, where he was a sophomore in fall 2002; he remained fully

24  _____

25      [7]   His Opposition also suggests an inchoate "guidance and counseling" claim may be
    intended.  *See* Opp. 12:20-13,14:3-4 ("Brett Kolb can no longer turn to his father for guidance when
26  he needs to make major decisions in his life").  However, he was not a minor at the time of his
    father's death, and the loss of the "fatherly advice" when he would "call[] his Dad frequently to ask
27  him for guidance and counseling[,] Karl always gave him kind, fatherly advice which lifted Brett's
    spirits" are insufficient as a matter of law to support a separate claim, even assuming "Brett Kolb and
28  his father were extremely close."  Opp. 12:19-13:16 (using such examples as getting advice on car
    questions, backpacking, shared memories about numerous trips they took together, relationship
    advice, and finances).

1   dependent on his parents for his educational and living expenses, tuition, books, room, and

2   board; he and his father spoke on the phone affectionately several times a week; he and his

3   parents would "frequently" visit back and forth between Billings and Santa Fe; he felt

4   "overwhelmed" when he heard of his father's death, it left "a big hole in Brett's life;" and he

5   thinks about his father every day and "still cannot accept the fact he will never see him

6   again."  B. Kolb Decl. pp. 2-4.

7          The court again rejects Plaintiffs' suggestion only a fact-finder "should be permitted

8   to assess the relative strength of the [loss of consortium] claims after a full factual hearing"

9   in purported "accordance with New Mexico law."  Opp. 15:20-21.  While it is true the

10  characterization of a consortium claimant's particular relationship with the victim is a question

11  of fact, the decision whether the damages claim should proceed to trial can and should be

12  determined by the court applying Rule 56 standards after the party resisting the Motion has

13  had an opportunity to present evidence and the record as a matter of law is insufficient to

14  permit a reasonable finding in the plaintiff's favor.  As discussed above, this court disagrees

15  there is no legal test under New Mexico common law for whether a plaintiff may recover

16  damages for loss of consortium and rejects the premise "there is no way meaningfully to

17  distinguish as a matter of law among the myriad scenarios that may present as a loss of

18  consortium claim."   Opp. 15:16-17.   The essential showing of an "intimate familial

19  relationship" does not appear flexible enough to encompass the claim of an adult child who

20  did not live with the decedent, where the claim is based solely on warm but only occasional

21  interactions and financial support during the college years.  For all the foregoing reasons,

22  Defendant's Motion is **GRANTED** with respect to Brett Kolb's loss of consortium claim.

23  **IV.   CONCLUSION AND ORDER**

24         The court appreciates the lives of these consortium claimants are permanently

25  changed by the loss of their decedents, and acknowledges each experiences emotional pain,

26  sorrow, and grief.  However, the court finds none has raised a triable issue of fact from which

27  a jury could reasonably conclude any of them had so intertwined a relationship with their

28  decedents that a jury must be permitted to reach the issue of damages, due to the unique

quality of the relationship warranting construction as imposing a foreseeable duty on a potential tortfeasor to compensate them for loss of the relationship.  New Mexico common law has identified factors pertinent to a finding a plaintiff should be permitted to pursue loss of consortium damages. They are not indicated here.  For the all the foregoing reasons, expressing no opinion on any other cause of action or theory of recovery of these or any of the other plaintiffs, **IT IS HEREBY ORDERED** all the loss of consortium claims challenged in the Motions fail as a matter of law, and the Motions are **<u>GRANTED</u>**.  Summary adjudication of the loss of consortium tort and loss of guidance and counseling claims (only) is accordingly decided in Defendant's favor as to Richard Lamphere, Lavonne Lamphere, Kathleen Attia-Alla, Kristin Ferris, Briana Chacon, Marissa Chacon, Donald Womble, Sr., Jeanne Womble, Donald Womble III, Kristin Womble, Amber Straubing, Gladys Larson, Raymond Larson, and Brett Kolb.

     **IT IS SO ORDERED**.

DATED:  March 21, 2008

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

06CV2174